BOBBIE R. SWAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Swan v. Commissioner
Docket No. 10614-77.
United States Tax Court
T.C. Memo 1979-13; 1979 Tax Ct. Memo LEXIS 514; 38 T.C.M. (CCH) 41; T.C.M. (RIA) 79013; January 8, 1979, Filed Bobbie R. Swan, pro se. Richard A. Jones, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax for the calendar years 1973 and 1974 in the amounts of $ 1,199.68 and $ 1,159.53, respectively, and additions to tax under section 6653(a), I.R.C. 1954, [1] of $ 59.98 and $ 57.98, respectively. One of the issues raised by the pleading having been conceded by respondent, the issues remaining for decision are (1) whether, and if so the extent to which, petitioner understated *515 her income from tips in each of the years here in issue; and (2) whether respondent properly determined an addition to tax under section 6653(a) for each of the years here in issue. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, who resided in Las Vegas, Nevada at the time of the filing of her petition in this case, filed individual Federal income tax returns for the calendar years 1973 and 1974. Petitioner was hired as a waitress by the Casino de Paris Showroom (Showroom) of the Dunes Hotel and Country Club (Dunes) on December 1, 1970. She continued her employment as a Showroom waitress at the Dunes until she voluntarily terminated her employment on June 10, 1974. During the years 1973 and 1974, petitioner's paid hours worked at the Showroom totaled 1,483 and 704, respectively. During the years 1973 and 1974 petitioner, in her work as a waitress in the Dunes Showroom, received tip income in cash and also received tip income through the payroll department of the Dunes. The tips she received through the payroll *516 department of the Dunes were included in her payroll checks and also included in her wages as reported by the Dunes on the Form W-2 provided to petitioner for each of the years here in issue. Petitioner reported cash tips received to the Dunes of $ 603.20 in 1973 and $ 681 in 1974, and these amounts were also included by the Dunes in the Forms W-2 furnished to petitioner for the years 1973 and 1974. The Dunes Showroom is a large room in which a floor show is presented twice nightly. One of the shows is a dinner show and at the second show drinks only are served. Some customers of the Showroom purchased prepaid tickets or came to the Showroom with a tour group. When tour groups were served, the tour group leader either purchased prepaid tickets for all members of the tour group, arranged with the Dunes to be billed for the members of the group or paid the cashier of the Showroom the evening the group came. In all instances of prepaid customers or tour group customers, regardless of the method of payment, the price of the ticket or the total price for the tour group included an amount representing a tip for the waiters or waitresses serving the ticket purchasers or the tour group. *517 For this reason we will refer to the individual ticket purchaser patron as well as the tour group patron as the ticket patrons of the Showroom. The price of the food and drinks for ticket customers was below the lowest minimum entree price of dinner for the dinner show and the drink minimum for the second show. However, under the union contract which the Dunes had with the waiters and waitresses (hereinafter collectively referred to as waitresses) for the years here in issue the portion of the ticket price allocated to tips on sales to ticket patrons could not be less than 15 percent of the lowest menu entree price for the dinner show or the minimum drink charges for the second show in effect at the time the tickets were used. As a result of this union requirement, the tips allocated on the dinner show in each of the years here in issue were $ 1.69 per ticket, and on the second show the tips were $ 1.28 and $ 1.35, respectively, for the years 1973 and 1974. For this reason the guaranteed tip to the waitress for the dinner show amounted to approximately 25 percent of the average amount included by the Dunes as ticket food sales in the year 1973 and 23 percent in 1974. For the *518 late show, the guaranteed tip amounted to 28 percent of the average per person amount of ticket sales included by the Dunes in its beverage revenue for the year 1973 and 30 percent in the year 1974. In 1973 and 1974, at least half of the Dunes Showroom customers were ticket purchasers. However, because of the ticket purchasers paying less for dinner and drinks than other patrons, the percentage of Showroom revenue from the ticket patrons would not be the same percentage of sales as the percentage of ticket patrons to total patrons. Some customers of the Showroom who were not ticket patrons paid their bills in cash and others paid by a credit charge card or by a charge on their bills for their rooms. In each of the years here in issue a number of the Dunes Showroom patrons were complimentary guests of the hotel. The majority of the complimentary guests were persons staying at the Dunes free of charge in order to encourage them to gamble at the Dunes. These persons were generally referred to as "junket comps." Some of the complimentary patrons were persons who had done extensive gambling in the Dunes hotel, resulting in substantial losses, and who had been offered a complimentary *519 dinner and drinks at the Showroom by the Dunes management. The complimentary patrons received favored treatment at the Showroom in terms of where they were seated and the service furnished to them. Although no charge was made to the complimentary patrons for food and drinks, the food and drink served to them were shown in the total sales of the Showroom on the books and records of the Dunes. The total amounts for sales to complimentary patrons included in the Dunes sales records were $ 1,207,656.52 for 1973 and $ 611,190.68 for 1974. The customer seating area at the Dunes is divided into a number of waitress stations for each show. For the dinner show waitresses worked in teams of two at each station, and the two waitresses shared their tips equally. There is only one waitress assigned to each station at the second show and therefore there is no tipsplitting for that show. One member of each team that worked the dinner show would work the second show so that each waitress worked the second show every other night of the days she worked. During the years 1973 and 1974 the number of Showroom stations for the dinner show and second show ranged up to 18 or 20, with the number *520 of seats in each station not less than 36. Some stations were preferable to others and therefore the Showroom stations were rotated among the waitresses on a daily basis. During the year 1973 the Showroom operated the dinner show 365 days and the second show 364 days. The total attendance at the Showroom during 1973 was 409,990, of which 188,796 attended the dinner show and 221,194 attended the second show. During 1974 each show was operated 361 days. The total attendance at the Showroom in 1974 was 398,020, of which 181,196 attended the dinner show and 216,824 attended the second show. The posted fire capacity for the Showroom for the years 1973 and 1974 was 542 persons for the dinner show and 650 for the second show. On some occasions, however, the actual seating in the Showroom exceeded the standard limits. Each waitress at the Dunes Showroom in 1973 and 1974 performed approximately the same percentage of paid setup and cleanup time to actual serving time. During the year 1973 and from January 1, 1974 until August 1974, the tips from sales to ticket patrons who had either paid in advance or for whom the tour group leader paid the cashier the night the tour group came *521 to the Showroom were paid to the waitresses serving the ticket patrons in cash at the end of the waitresses' working period in the Showroom. When ticket patrons were part of tour groups in instances where the group leader was billed later by the Dunes hotel, no amount of the tip was paid to the waitress in cash on the day she served the group. The tips on these sales were accounted for through the Dunes payroll department and each waitress's portion of the tips on such sales was paid to her as part of her regular payroll check. During 1973 and until August 1974 the tips on approximately one-half of the ticket sales were paid in cash to the waitresses and were not included in the amounts reflected on the Dunes payroll record and therefore were not included as "wages, tips and other compensation" on the Forms W-2 provided the waitresses by the Dunes at the end of each of the years 1973 and 1974. The tips on sales to ticket patrons of the Showroom which were reflected on the records of the Dunes payroll department and thus included in the Forms W-2 provided to the Showroom waitresses totaled $ 148,257.90 and $ 211,121.96 for the years 1973 and 1974, respectively. The total paid *522 hours worked by all waitresses at the Showroom during the years 1973 and 1974 totaled 72,910.5 and 68,557, respectively. Waitresses who served individual ticket patrons and small groups of ticket patrons received either in cash or through their pay checks the entire amount of the tip applicable to the patron served. However, where service was to large tour groups of over 25 ticket patrons, or the total amount of dollar receipts from a group of ticket patrons was as large as that for such large groups, the Showroom captain received a portion of the tip applicable to the patrons so served. In cases of large groups, the waitresses revcived from 73 to 86 percent of the guaranteed tip. Petitioner, during each of the years 1973 and 1974, took whatever station was assigned to her. She was assigned about the same number of ticket patrons as other waitresses. For 1973 and 1974 the guaranteed tips which petitioner received through her payroll check from the Dunes Showroom were $ 2,868.96 and $ 1,916.75, respectively. All other tips received by petitioner in each of these years were received in cash. Where a customer had charged his purchases of food and drinks to a credit card or *523 to his hotel room at the Dunes, the amount of tips shown on the charge was paid in cash to the waitress at the conclusion of her evening's work.In some instances a cash customer would leave no tip for petitioner. Also, in some instances, a complimentary customer would leave no tip for petitioner. Petitioner kept no record of either her cash tips or tips received through her payroll checks in either of the years 1973 or 1974, except for the amount of cash tips she reported to the Dunes as being received by her. Petitioner has worked for over 30 years as a waitress and her work has been considered satisfactory in every place where she has worked. Any place she has worked has been agreeable to reemploying her if she sought reemployment. She is pleasant to customers and makes an effort to please them. The following schedule shows the amounts entered in the records of the Dunes as Showroom sales, cabaret tax, sales tax and total: 1973
1974
Showroom Sales
(excluding taxes)
$ 4,014,262.54
$ 3,918,981.55
Cabaret Tax
359,346.86
323,208.87
Sales Tax
125,279.96
112,417.49
$ 4,498,889.36
$ 4,354,607.91
Respondent's agent, in investigating the *524 records of the Dunes and the waiters and waitresses who worked there, reviewed the sales charged by individual patrons to their rooms at the Dunes for 52 different days scattered throughout the year 1973. Each of these charge sales used by respondent's agent, which he referred to as "front office charges," showed some amount of tip listed on the charge. The total front office charges, including tax for the 52 days reviewed by respondent's agent, in 1973 was $ 78,501.48. During the year 1974, respondent's agent reviewed 7 days of front office charges scattered throughout the year. The total of such charges, including tax for the 7 days, was $ 8,140.29. Respondent's agent separately added up the tips shown on the front office charges for the 52 days in 1973 and the 7 days in 1974 and computed a percentage of tips to total sales in 1973 of 15.8 percent and in 1974 of 16.1 percent. These percentages were on the basis of the total charges including tax. To determine total tip income of all waitresses in the Showroom respondent's agent subtracted from total gross sales, including taxes, of the Showroom in each of the years 1973 and 1974, 25 percent of the total amount to compensate *525 for persons who left no tip, the fact that cash customers may tip less than charge customers and the fact that waitresses vary in skill. The remaining 75 percent of the gross sales of the Showroom in each year was multiplied by 15.8 percent to obtain the total tips received by all waitresses in the year. [2] The amount arrived at by multiplying 75 percent of total sales of the Showroom in each year by 15.8 percent was reduced by 16.67 percent to allow for tips distributed by waitresses to busboys and bartenders. From the amount of such reduced tips, the amount of contract tips paid to the captains was subtracted to arrive at total tip income computed to be retained by all waitresses. This total tip income computed to be retained by waitresses was divided by the total paid hours worked by waitresses to arrive at an amount of cash tips per hour worked by waitresses. The hourly amount computed on this basis was $ 6.67 in 1973 and $ 7.41 in 1974. [3]
*526 Respondent's agent computed the total amount of tips received by petitioner in each of the years 1973 and 1974 by multiplying the total hours she worked in each year by this computed average tip per hour received by all waitresses in that year. [4]
Petitioner on her Federal income tax return for 1973 included as tips received $ 4,294.96, composed of $ 2,868.96 of guaranteed tips included in payroll checks, $ 603 of cash tips reported to her employer and $ 823 of other cash tips. For the year 1974, petitioner reported on her Federal income tax return as tips received the amount of $ 2,597.75, composed of $ 1,916.75 of tips included in payroll checks and $ 681 of cash tips reported to her employer. Respondent in his notice of deficiency determined that petitioner received total tip income of $ 9,892 and $ 5,176.84 for the taxable years 1973 and 1974, respectively, and on this basis determined that petitioner had understated tip income by $ 5,598 in 1973 and $ *527 2,579.09 in 1974. OPINION Petitioner first contends that tips which were not included in petitioner's payroll checks are gifts and not compensation. On numerous occasions we have held that tips do constitute compensation for services rendered and are includable in a taxpayer's gross income under section 61(a). Schroeder v. Commissioner,40 T.C. 30, 33 (1963), and cases there cited. Petitioner next contends that if tips received in cash are considered income it is up to respondent to prove the amount of tip income received by petitioner. Petitioner argues that the formula used by respondent based on averages is not proof of the amount of tip income petitioner received. This contention by petitioner is likewise erroneous. The record here shows that in 1973 and 1974 petitioner kept no books or records with respect to the tip income she received. Where a taxpayer keeps no record from which his taxable income may be properly computed, respondent is authorized under the provisions of section 446 to compute a taxable income under such method as in his opinion does clearly reflect income. Where a taxpayer has kept no records, use of a method for computing tip *528 income similar to that used by respondent in this case has been approved by this and other courts. See Mendelson v. Commissioner,305 F.2d 519 (7th Cir. 1962), affirming a Memorandum Opinion of this Court. [5]
In our view, respondent's computation of total tip income received by petitioner for the year 1973 is most reasonable except that $ 5.82 per hour rather than $ *529 6.67 should have been used. [6] Respondent computed petitioner's total tip income for 1973 at $ 9,892. On the basis of a proper computation this figure should have been $ 8,631.06. Petitioner estimated that she served about the same amount of ticket patrons as other waitresses. This would mean that about half the persons she served were ticket patrons. If it is assumed that in fact the ticket patrons served by petitioner were 50 percent of the patrons she served in 1973, and that half her tips received from such patrons was in cash, the result of respondent's computation as corrected for 1973 would be that she received over $ 2,800 less in that year as tips from cash, charge and complimentary patrons than she did from the same number of ticket patrons. On the basis of this record as a whole, we sustain respondent's computation as corrected of petitioner's tip income for 1973. [7]
*530 Respondent's computation for 1974 is essentially the same as for 1973 except that he used the percentage of tips to sales from front office charges for 1973 to apply to 1974. Respondent recognized that the 7 days used as a sample of front office charges in 1974 was an inadequate sample. Since the 7-day period came out to 16.1 percent tips to sales as compared to a ratio of 15.8 for 1973, respondent argues that his use of the 1973 percentage is favorable to petitioner. If nothing better appeared in the record, we would be inclined to accept respondent's 1974 computation as the best evidence available and conclude that any error against petitioner was of her own making for failure to keep adequate records. However, we do not conclude, as does respondent, that because the computation for 7 days showed a 16.1 percent tip ratio an adequate sample would have shown this amount or the 15.8 percent ratio derived in 1973. Prices were slightly higher in 1974 for certain items as shown by the increase in the tip on the minimum charge for the second show for sales to ticket patrons where a tip of 15 percent of the minimum was required. Also, the record indicates that the average price *531 paid by ticket patrons for the dinner show was somewhat higher in 1974 than in 1973, but apparently the lowest entree menu price in effect for the dinner show was the same in 1973 and 1974 since the tip for that show for ticket patrons remained the same. The tips received by waitresses for the dinner show from ticket patrons averaged 25 percent of such sales in 1973 and 23 percent in 1974. Total attendance and total sales were somewhat less in 1974 than in 1973. With respect to tips, this reduced attendance was compensated for by the fact that total hours worked by all waitresses decreased from 72,910.5 in 1973 to 68,557 in 1974. The record shows that the dinner show operated 365 days in 1973 and the second show 364 days, whereas each of these shows only operated 361 days in 1974. Dividing the 72,910.5 hours worked by all waitresses in 1973 by 365 days results in approximately 200 hours of work by all waitresses each day of operation of the Showroom in 1973. Therefore, over 700 of the fewer hours worked by all waitresses in 1974 would be accounted for by the fewer days of operation. Considering this record as a whole, the overall indication is that a waitress in 1974 would *532 receive approximately the same tips per hour as she received in 1973 or perhaps slightly higher tips per hour in 1974 on ticket patrons. Therefore, in our view the most reasonable way on this record to compute petitioner's tips for 1974 is to multiply the corrected hourly rate of tips she was computed to have received in 1973 of $ 5.82 by the 704 hours she worked in 1974. The result of such a computation is total tips received in 1974 of $ 4,097.28. When the total tips reported by petitioner in 1974 of $ 2,597.75 is subtracted from this figure, her resultant understatement of tip income for 1974 is $ 1,499.53. We therefore hold that petitioner understated her tip income for 1973 in the amount of $ 4,336.10 as determined by respondent's computation as corrected, and understated her tip income in 1974 by the amount of $ 1,499.53. Petitioner has failed to show error in respondent's determination of the addition to tax for negligence under section 6653(a). In fact it was negligent of petitioner not to keep accurate records of the tips she received. We therefore sustain respondent's determination of the addition to tax under section 6653(a) in each of the years here in issue. *533 Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. Respondent's agent testified that the higher tip percentage computed on the basis of 7 days in 1974 was not used since he did not consider the 7 days to be a representative sample. ↩
3. The figures of $ 6.67 for 1973 and $ 7.41 for 1974 are those used by respondent in his notice of deficiency and which the agent testified were the result of the computation as outlined in the opinion. Using the figures and computation as testified to by respondent's agent, we arrive at an amount of $ 5.82 for 1973 and $ 5.95 for 1974, computed as follows: 1973 $ 4,498,889.36 -(1,124,722.30) =3,374,167.06 [25% x $ 4,498,889.36] x 15.8% = 533,118.38 -( 88,870.83) = 444,247.55 [16.67% x $ 533,118.38] -( 20,000.00) = 424,247.55 / 72,910.5 hours = $ 5.8187442 = $ 5.82 per hour 1974 $ 4,354,607.91 -(1,088,651.90) = 3,265,956.01 [25% x $ 4,354,607.97] x 15.8% = 516,021.04 -( 86,020.70) = 430,000.34 [16.67% x $ 516,021.04] -( 22,000.00) = 408,000.34 / 68,557 hours $ 5.9512572 = $ 5.95 per hour Therefore, the total amount of tips received by petitioner mathematically properly computed under the formula worked out by the revenue agent and used as the basis of the notice of deficiency should have been $ 8,631.06 for 1973 and $ 4,188.80 for 1974.↩
4. The amount actually used by respondent in the 1974 computation is $ 7.35 per hour, but the use of this lessor amount is not explained in the record, the testimony being that the overall computed average was used.↩
5. Petitioner also argues that since most of the waitresses of the Dunes Showroom settled their cases with respondent for less than the amount computed under the formula used by respondent, a lesser amount should be used in her case. The record does not show whether other waitresses settled their cases with respondent or the basis of such settlements. Petitioner's argument in this respect at the hearing is not evidence. However, even if the record did show settlements made between respondent and other waitresses, this fact would be totally immaterial to the determination in petitioner's case. All this would show would be that, for undisclosed reasons, waitresses and respondent agreed to the amount of the tax liability of those waitresses, which would have no relevance to petitioner's case.↩
6. Petitioner contends that applying the tip percentage to sales including tax is unfair. However, since the 15.8 percent was computed as the percentage to sales including tax, there is no merit to this contention. The percentage of tips would have been greater had it been computed on the basis of front office sales excluding tax. ↩
7. $ 2,868.96 of ticket patron tips paid in petitioner's payroll checks plus $ 2,868.96 of ticket patron tips paid in cash is $ 5,737.92. $ 8,631.06 minus $ 5,739.92 equals $ 2,891.14. $ 5,737.92 minus $ 2,891.14 equals $ 2,846.78.↩